Diane NELSON, Plaintiff,

v.

GLOBE INTERNATIONAL, INC., Globe Communications, Inc., and "Globe", Defendants.

No. 84 Civ. 4726 (GLG).

United States District Court, S.D. New York.

Jan. 14, 1986.

Goetz and Fitzpatrick, P.C., New York City, for plaintiff; Harvey A. Wechsler, of counsel.

Milgrim Thomajan Jacobs & Lee, P.C., New York City, for defendants; Andrew L. Deutsch, Paul M. Levy, Deutsch, Levy & Engel Chartered, Chicago, Ill., of counsel.

GOETTEL, District Judge.

This diversity action for defamation and violation of Sections 50 and 51 of the New York Civil Rights Law, N.Y. Civ. Rights Law §§ 50 and 51 (McKinney 1976), arises out of an article in the April 24, 1984, GLOBE magazine ("GLOBE") entitled "The Marshmallow Diet" ("the article"). The article outlined a weight-loss program incorporating marshmallows, discussed some of its ancillary benefits, quoted several nutritionists, and included the diet itself.[1] The subject of this lawsuit is a one-sentence paragraph in the article concerning Diane Nelson ("Nelson"), the plaintiff in this lawsuit. That sentence reads, "Diane Nelson, of the Bureau of Nutrition, in New York, was instrumental in preparing this marshmallow-based diet to help GLOBE readers lose up to a pound a day." Nelson Affidavit, Exhibit B. Nelson claims that she was both shocked and horrified to learn that she had been named in the article as being instrumental in preparing the Marshmallow Diet. She commenced this action in the Supreme Court of the State of New York on June 5, 1984. GLOBE removed the action to this Court on July 3, 1984, where it was assigned to Judge Sofaer. It has since been reassigned to me.

Defendants Globe Communications Corp. and Globe International, Inc. now move for summary judgment on the plaintiff's claims

---

1. The text of the article follows:

You can lose a pound a day, and boost your energy at the same time, with an amazing new diet based on marshmallows.

That's the message from nutritionists who say you don't need to go hungry either, because marshmallows are jam-packed with appetite-slashing carbohydrates and proteins.

"Marshmallows are the best all-natural appetite suppressant we have—and they taste good, too," declares Dr. Elizabeth Whelan, director of the American Council on Science and Health, in New York City.

Dr. Evangelos Giziz, an adjunct professor of nutrition at New York University, adds: "Read the label on a package of marshmallows. You'll see they contain egg white—a source of complete protein—and gelatin, another high protein source.

"This concentration of protein is involved in the release of phenylalanine, an amino acid, or building block, that signals your brain that you no longer require food, and substances that make you feel full."

GLOBE's experts stress that marshmallows are only one part of the balanced diet you need to stay healthy—and still lose a pound a day.

"Be sure to keep within your daily caloric range," says Whelan, "and you'll soon see the effects."

Diane Nelson, of the Bureau of Nutrition, in New York, was instrumental in preparing this marshmallow-based diet to help GLOBE readers lose up to a pound a day.

The diet provides all the vitamins, minerals and nutrients a healthy adult needs on about 1,200 calories a day. Include unsweetened coffee or tea—and a full ounce of marshmallows with every meal.

BREAKFAST
(Choose one from each group):
½ medium cantaloupe; 1 cup strawberries; medium orange; 4 oz. orange or grapefruit juice; large tangerine; ½ medium grapefruit; 8 oz. tomato juice.

2 oz. cottage or pot cheese; 1 oz. hard cheese; 2 oz. cooked or canned fish; 1 egg, 8 oz. skim milk.

1 slice bread; ¾ cup ready-to-eat cereal; ½ cup cooked cereal.

LUNCH
(Choose one from each group):
2 oz. fish, poultry or lean meat; 4 oz. cottage or pot cheese; 2 oz. hard cheese; 1 egg; 2 level tbsp. peanut butter.

1 slice bread, wholegrain or enriched; vegetable, raw or cooked (except potato); 1 serving fruit.

DINNER
(Choose one from each group):
4 oz. baked or broiled fish, whitemeat chicken or lean beef.

Broccoli, carrots, winter squash, mustard greens, chicory, pumpkin, watercress, escarole, collards (or other leafy greens), spinach. 1 serving fruit.

OTHER DAILY FOODS
(Choose three):
tsp. vegetable oil, tsp. mayonnaise, 2 tsp. French Dressing; tsp. margarine with liquid vegetable oil. (Choose two): cup buttermilk; cup evaporated skim milk; ⅔ cup nonfat dry milk solids.

Nelson Affidavit, Exhibit B.

for defamation and invasion of privacy.[2] For the reasons stated below, their motion is granted.

## I. Background

Defendant Globe International, Inc. publishes GLOBE, a weekly periodical sold at newstands and supermarkets.[3] In January 1984, various senior editors of GLOBE met for a story conference, where they discussed possible topics for articles. At the conference, Robert Taylor, an associate editor, suggested basing an article on a weight-loss program incorporating marshmallows. GLOBE's assignment editor contacted Carlson Wade ("Wade") about writing the article and suggested several ideas for it.

Wade, an experienced writer in the field of diet and health, had previously written numerous magazine articles on topics relating to health, diet, and nutrition. He had been an editor of Popular Medicine, a diet-related magazine, and a medical editor and columnist for Pageant magazine. In addition, Wade had authored books on nutrition and diet-related topics. Wade had previously written 15 articles for GLOBE, the veracity or accuracy of which had never been challenged. (Wade has since written ten more articles for GLOBE.) GLOBE's editors suggested topics for many of Wade's articles. Wade conceived others himself. Wade is not named as a defendant in this action.

After receiving a topic suggestion from GLOBE's editors, Wade researches the topic to determine its viability. Thus, after receiving the call from GLOBE's assignment editor, Wade researched his suggestion. Wade decided that marshmallows could be substituted for other carbohy-drates in a diet, and that such a diet could still permit significant weight loss. Wade decided to work with a diet in his files entitled "Eat to Lose Weight!" The New York City Department of Health, Bureau of Nutrition ("Bureau of Nutrition") had originally prepared this diet. However, since 1981, the Bureau of Nutrition has neither distributed nor endorsed this diet. Another diet of the same name has been substituted for it. Wade modified the "Eat to Lose Weight!" diet by deleting certain carbohydrates and substituting marshmallow snacks.

He states that he then began to contact nutritionists to see whether they would confirm his findings that the modified "Eat to Lose Weight!" diet could bring about a loss of weight while suppressing the urge to overeat. He says he spoke to Dr. Elizabeth Whelan, a public health professional; Professor Evangelos Gizis, an adjunct professor in the Department of Home Economics and Nutrition at New York University; and Mildred Levine and Diane Nelson, staff nutritionists at the Bureau of Nutrition. Wade says that he incorporated the comments of Whelan and Gizis into his article. He also maintains that Nelson gave him permission to use her name in connection with the article. Whelan, Gizis, Levine, and Nelson uniformly deny ever having spoken to Wade or to anyone else from GLOBE about the diet. The first three named have not sued.

Following the alleged conversations, Wade typed his article. His sole reference to Nelson was a statement that "[t]ogether with Diane Nelson, a nutritionist with the Bureau of Nutrition, the following diet was prepared." Nelson Affidavit, Exhibit C. Wade submitted his typed draft to

---

**2.** The amended complaint originally contained three causes of action. The plaintiff subsequently dismissed the third claim, for intentional infliction of emotional distress, with prejudice. In an order dated September 25, 1984, Judge Sofaer denied the defendants' motion to dismiss the plaintiff's libel claim for failure to allege a defamatory statement. That determination is the law of the case.

**3.** The complaint names Globe International, Inc., Globe Communications, Inc., and "GLOBE" as defendants. The former publishes GLOBE. The Court presumes that Globe Communications Corp., identified in the complaint as Globe Communications, Inc., is the parent of Globe International, Inc. "GLOBE" is neither a corporate entity nor a proper party to this suit. Hereinafter, the defendants are collectively referred to as "GLOBE."

GLOBE's assignment editor. Shortly thereafter, Wade was contacted by a GLOBE editor who requested and received the names, titles, and telephone numbers of the individuals Wade had spoken to and the dates of the various conversations. After receiving Wade's piece, the assignment editor forwarded it to Robert Taylor, the associate editor in charge of rewriting. The copy was first edited by Derek Clontz, a rewrite editor, who edited it for style and clarity. Clontz substantially shortened the article and many of the quotations therein. Taylor reviewed the original copy and Clontz's rewrite, made further changes, and submitted the edited copy to Cliff Barr, GLOBE's editor. Barr looked at it and approved it for publication. GLOBE did not verify the contents of the article or the nutritional validity of the diet.

In its final form, the article contained the following sentence: "Diane Nelson, of the Bureau of Nutrition in New York, was instrumental in preparing this marshmallow-based diet to help GLOBE readers lose up to a pound a day." Prior to publication, the entire April 24 issue, including the article in question, was submitted to GLOBE's outside counsel for libel review. Since the Marshmallow Diet article did not appear defamatory, counsel did not discuss it with GLOBE's editors.

Nelson learned of the article and its reference to her shortly after its publication. At that time, she was one of eight staff nutritionists employed by the Bureau of Nutrition. (She is now on maternity leave.) She had several responsibilities. From time to time, she reviewed nutrition books in order to determine their reliability and credibility. She also answered inquiries from the press and public on matters relating to nutrition. Finally, Nelson was responsible for nutrition education in two areas of Brooklyn. In that capacity, she gave talks concerning general nutrition to various community groups. Nelson based those talks on materials supplied by the Bureau of Nutrition.

## II. Discussion

### A. The Defamation Claim

In the landmark case of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held for the first time that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." *Id.* at 283, 84 S.Ct. at 727. A public official may not recover "damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended the protections of *New York Times v. Sullivan* to "public figures." There are two types of public figures.

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974). "[T]he states ... retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of an individual who is neither a public official nor a public figure." *Id.* at 345–46, 94 S.Ct. at 3010. "So long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010.

The defendants contend that the plaintiff is both a public official and a limited purpose public figure. As discussed at length below, we find no merit in either contention. Consequently, New York's law with

respect to defamation applies. That law, in turn, also shields the defendant from liability in this case.

### 1. Diane Nelson: A Public Official?

The Supreme Court has consistently sidestepped opportunities to precisely define the term public official. *See Hutchinson v. Proxmire,* 443 U.S. 111, 119 n. 8, 99 S.Ct. 2675, 2680 n. 8, 61 L.Ed.2d 411 (1979) ("The Court has not provided precise boundaries for the category of 'public official....' "); *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966) ("No precise lines need be drawn for the purposes of this case."); *New York Times v. Sullivan, supra,* 376 U.S. at 283 n. 23, 84 S.Ct. at 727 n. 23 ("We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend ..., or otherwise to specify categories of persons who would or would not be included."). On the other hand, despite expanding the category of "public officials" to include, among others, a recreation supervisor, *Rosenblatt v. Baer, supra,* a county clerk, *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967), and a deputy sheriff, *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court has consistently stated that "the category of 'public official' ... cannot be thought to include all public employees...." *Hutchinson v. Proxmire, supra,* 443 U.S. at 119 n. 8, 99 S.Ct. at 2680 n. 8; *see also Rosenblatt v. Baer,* 383 U.S. 75, 86–87 n. 13, 86 S.Ct. 669, 676 n. 13 (statement would not warrant *New York Times v. Sullivan* protection "merely because a statement defamatory of some person in government employ catches the public interest."). A large number of courts have disregarded the latter admonition and deemed countless individuals at the lowest echelons of government service to be "public officials."

**4.** A small but growing number of courts have heeded the Supreme Court's language and narrowly construed the scope of the public official designation. *See* D. Elder, *Defamation, Public Officialdom and the* Rosenblatt v. Baer *Crite-*

*See* D. Elder, *Defamation, Public Officialdom and the* Rosenblatt v. Baer *Criteria—A Proposal for Revivification: Two Decades After* New York Times Co. v. Sullivan, 33 Buff.L.Rev. 579, 634–40 (1984) (listing over 40 examples).[1] The defendants rely on a number of these cases to support their argument that the plaintiff is a public official. The Court, however, lacks confidence in this authority, which plainly ignores the admonitions of the Supreme Court. Instead, we take our cue from the language and policies that the Court·has relied upon in justifying the protections it provides to those who criticize public officials.

Two policies underly the protections afforded such criticism. First, protecting speech about "public officials" should encourage debate about an issue of the highest importance in any democratic society, the operation of the government and the formulation of government policy.

> Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

> \*     \*     \*     \*     \*     \*

> Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, ... the *New York Times* malice standards apply.

*ria—A Proposal for Revivification: Two Decades After* New York Times Co. v. Sullivan, 33 Buff.L. Rev. 579, 640–43 (1984) (Listing governmental agents or employees deemed not to have relinquished their private status).

*Rosenblatt v. Baer, supra,* 383 U.S. at 85–86, 86 S.Ct. at 675–76. "The employee's position must be one which would invite public scrutiny and discussion of the person holding it entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* at 87 n. 13, 86 S.Ct. at 676 n. 13. Otherwise, criticism of the official is not of the kind entitled to special constitutional protection.

A second policy underlying the special treatment accorded criticism of public officials focuses on the status of those individuals. Public officials are less in need of monetary recovery because they both assume the risk that they may be defamed and are more capable of negating the effects of defamatory statements. As the Supreme Court explained,

> [p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.
>
> More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties.

*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 344, 94 S.Ct. at 3009.

The two underlying policies, one based on the status of the defamed individual, the other on the content of the defamatory statement, tend to converge. A government official with significant policymaking authority who assumes a role independent of any particular controversy will more likely have access to the media and have assumed the risk of unfavorable public comment.

■ Neither policy would be served by deeming the plaintiff a public official. The plaintiff is one of eight public information officers at the Department of Nutrition. She answers public and media inquiries, speaks to public groups, and reviews written materials. She neither formulates nor supervises the implementation of policy. Her duties do not invite scrutiny or discussion independent of any particular controversy in which she may be involved. Moreover, by accepting her current position, she could not have reasonably anticipated public comment on her performance and behavior in her personal and public life. Nor did she gain access to the media to rebut the charges against her. Her position as a public information officer is not a pulpit for the rebuttal of attacks on her person. In fact, her contact with the media is severly circumscribed. In short, the plaintiff is not a "public official" within the meaning of *New York Times v. Sullivan* and its progeny.[5]

### 2. Limited Purpose Public Figure

■ We can dispose of the contention that the defendant is a limited purpose public figure without protracted analysis. In order to establish that the plaintiff is a limited purpose public figure, a defendant must show that the plaintiff has:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) main-

---

**5.** It is for the Court to determine whether the plaintiff in a defamation action is a public official and/or a public figure. *Rosenblatt v. Baer,*

383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966).

tained regular and continuing access to the media.

*Lerman v. Flynt Distributing Co.,* 745 F.2d 123, 136–37 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985). Although the plaintiff has shared information with the public, she has never invited any attention to her own views. Nor can it be said that by answering an inquiry from Carlson Wade (if, in fact, she did), she injected herself into this controversy.

3. New York Law

■ GLOBE is left to the protection that New York affords defendants in defamation actions brought by private individuals. In *Chapadeau v. Utica Observer Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y. S.2d 61, 341 N.E.2d 569 (1975), the New York Court of Appeals supplied the controlling standard. The court stated,

> [w]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Id.* 379 N.Y.S.2d at 64, 341 N.E.2d at 571.

Under *Chapadeau,* the initial inquiry is whether the article in question "is arguably within the sphere of legitimate public concern." Matters of general interest such as entertainment and health, as well as so-called "hard news," are within this sphere. *See Ortiz v. Valdescastilla,* 102 A.D.2d 513, 478 N.Y.S.2d 895, 899 (1st Dep't 1984) (entertainment column describing incident involving well-known Venezuelan actress is within the sphere of legitimate public concern); *National Nutritional Foods Association v. Whelan,* 492 F.Supp. 374, 382 (S.D.N.Y.1980) (article concerning "health food" industry concerns matters of great public importance); *cf. Hoffman v. Wash-*

*ington Post Co.,* 433 F.Supp. 600, 604 (D.D. C.1977), *aff'd w'out op.,* 578 F.2d 442 (D.C. Cir.1978) (field of protein supplements is a matter of public interest). Diets and dieting, subjects of great interest to many Americans, are also of interest to the public. Because a particular diet strikes some as strange, novel, or even humorous does not remove it from the realm of public concern. Nor does its inclusion in a publication that some would term a sensational tabloid entitle it to any less protection. Whether GLOBE invented the diet is irrelevant as well. The subject matter of the article, not its accuracy, controls the initial inquiry under *Chapadeau.*

Since the article concerned a matter of public concern, the plaintiff may only recover if GLOBE was grossly irresponsible in publishing the statement concerning her. Although the question of gross irresponsibility is not solely for the court, a court may award summary judgment on the issue of gross irresponsibility where a sufficient showing is made for or an insufficient showing is made against the motion. *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 435 N.Y.S.2d 556, 562, 416 N.E.2d 557, 563 (1980).

There are several recognized indicia of reliability that negate any inference of gross irresponsibility. A publisher is not grossly irresponsible, if it "publishes information from a dependable source of news unless [it] had, or should have had, substantial reasons to question the accuracy of the information or the *bona fides* of [its] source." *Ortiz v. Valdescastilla,* 102 A.D.2d 513, 478 N.Y.S.2d 895, 899 (1st Dep't 1984). The publication of a great number of articles over a substantial period by the freelance journalist in question without the accuracy of those articles ever having been challenged provides sufficient reason to trust that source. *Id.* (Articles appeared in *El Diaco* for 10 years; none were criticized or disputed); *Jenkins v. R.G.H. Publishing Co.,* No. 79–6227, *slip op.* at 2 (S.D.N.Y. June 15, 1981) (available on Lexis, Genfed Library) (work of freelance journalist had not previously been the

target of defamation lawsuits). Other indicia of responsible publishing practices are careful checking by in-house editors and review by outside libel counsel. *Chapadeau, supra,* 379 N.Y.S.2d at 65, 341 N.E.2d at 571–72 (article checked by two persons other than author); *Ortiz, supra,* 478 N.Y.S.2d at 899 (same); *Jenkins, supra, slip op.* at 2 (The defendants circulated the article to various assistant editors who were instructed to check it carefully for accuracy.).

GLOBE manifested each of these indicia of responsible journalism. GLOBE trusted Wade as an experienced journalist and a frequent contributor, none of whose 15 articles, over the course of 3 years, had ever been the target of a defamation suit or had otherwise been questioned. GLOBE circulated the article to three editors for checking and editing. The article was then forwarded to libel counsel. Only after the article received a clean bill of health from libel counsel was it published. "This is hardly indicative of grossly irresponsible conduct. Rather it appears that the publisher exercised reasonable methods to insure accuracy." *Chapadeau, supra,* 379 N.Y.S.2d at 65, 341 N.E.2d at 572.

Nelson contends that GLOBE had several reasons to question the accuracy of the article and the reliability of its author. Close examination reveals the fallacies in these contentions. Nelson first points out that GLOBE conceived the "Marshmallow Diet." Whether a freelance journalist receives the idea for a story from the publisher or formulates it himself has no bearing on the publisher's responsibility. Free lance reporters often receive story ideas from publishers. They develop those that seem feasible and reject others, *see infra* pp. 978–79. Nelson next notes that Wade did not have a college or graduate degree in nutrition. This has no bearing on the question of gross irresponsibility. Many journalists are generalists, who write articles by drawing information from the "ex-

perts." If, as the plaintiff suggests, the media should be subjected to possible punishment for publishing an article on a medical or scientific subject because the author does not hold an advanced degree in the subject, reporting on such subjects will be far less frequent and vigorous.

Unable to fix liability on GLOBE by virtue of its supervision of Wade, Nelson next attempts to impute Wade's conduct to GLOBE (1) through application of the doctrine of *respondeat superior* and (2) because GLOBE edited Wade's copy before final publication. Both attempts to impute Wade's conduct to GLOBE fail.

### a) Respondeat Superior

If Wade had been a GLOBE employee when he wrote the article, Wade's conduct would be attributable to GLOBE under the doctrine of *respondeat superior*, and GLOBE might be liable to Nelson. On the other hand, GLOBE is not responsible for Wade's actions if he was an independent contractor. *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 253, 95 S.Ct. 465, 470, 42 L.Ed.2d 419 (1974); *Ortiz v. Valdescastilla, supra,* 478 N.Y.S.2d at 899. Not surprisingly, the plaintiff argues that Wade was a GLOBE employee when he wrote the article.

The Second Circuit discussed the methodology for determining whether someone is an employee or an independent contractor in *Hilton International Co. v. NLRB,* 690 F.2d 318, 320 (2d Cir.1982).[6] The court stated,

> an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the "manner and means" by which the purported employee brings about that result.... [T]his test is difficult to apply since the result is necessarily a function of the manner and means employed. Nevertheless, "the more detailed the supervision and the stricter the enforcement standards, the

**6.** Although *Hilton International Co. v. NLRB* discusses the employee/independent contractor distinction in the context of the National Labor Relations Act and issues arising thereunder, the New York Courts apply the test applied in this and other NLRB cases. *Id.* at 318.

greater the likelihood of an employer-employee relationship...." Factors which may be considered in determining employee status include: whether the purported employee is engaged in a distinct occupation or business; whether the work involved is usually done under an employer's direction or by an unsupervised specialist; the skill involved; who supplied the instrumentalities and place of performance; the length of employment; the method of payment (by the time or by the job); whether the work is part of the employer's regular business and/or necessary to it; and the intent of the parties creating the relationship. No single factor is determinative.

*Id.* (citations omitted). Other factors are whether the employer withholds taxes or social security, *Ketcham v. Hall Syndicate, Inc.,* 37 Misc.2d 693, 236 N.Y.S.2d 206, 211 (Sup.Ct.N.Y.County 1962), *aff'd,* 19 A.D. 611, 242 N.Y.S.2d 182 (1st Dep't 1963), whether the worker receives fringe benefits, and how the parties themselves view the relationship. *Long Island Daily Press Publishing Co. v. Tomitz,* 12 Misc.2d 480, 176 N.Y.S.2d 215, 220 (Sup.Ct. Queens Co.1958). If the employer has the right to control the details of work, the worker is an employee; if the employer can only control the result (even the details of the result), the worker is an independent contractor. *In re Morton,* 284 N.Y. 167, 172, 30 N.E.2d 369 (1940).

■ The facts provided the Court lead inexorably to one conclusion. Wade was an independent contractor. Wade alone controlled the manner in which the article was written; he selected and interviewed sources, including, purportedly, the plaintiff, without any guidance from GLOBE. He devised the diet and chose the words, style, and order of his finished copy. At no time from the time Wade agreed to write the article until the time he submitted his copy to GLOBE did any GLOBE editor ever attempt to interfere with Wade's research or writing. Wade was paid a flat $175.00 fee for the article. He was not salaried by GLOBE, and did not receive fringe benefits. GLOBE paid no Social Security tax

for Wade, and GLOBE withheld no income tax on its payments to Wade. Wade worked out of his own office, used his own research materials, contacted sources on his own telephone, and typed copy on his own typewriter using his own materials. Both GLOBE and Wade regarded their relationship as one of independent contracting.

The plaintiff has provided no evidence to refute this overwhelming proof that Wade was an independent contractor. Indeed, most of the factors that the plaintiff emphasizes have no bearing on Wade's status as an independent contractor. Certainly the fact that an independent contractor has worked on previous assignments for an employer does not make him any less independent. And the fact that GLOBE suggested the idea for the article is irrelevant to Wade's status. By definition, in an employer-independent contractor relationship, the employer hires the contractor to do a specific, defined job. Although mindful of the proscriptions in this Circuit against the award of summary judgment, we must conclude that Wade, in writing the article, acted as an independent contractor. He, alone, is responsible for any torts he may have committed.

b) Editing

■ The plaintiff also argues either that GLOBE became a co-author by editing the article, or, that GLOBE's editing is, at a minimum, evidence of gross irresponsibility.

GLOBE's editing did not alter the content of Wade's submission. GLOBE restated, in more readable form, the factual assertions contained in Wade's copy. In particular, the statements concerning Nelson are a cautious restatement of Wade's copy. The single reference to the plaintiff in Wade's copy read, "Diane Nelson, of the Bureau of Nutrition, in New York, was instrumental in preparing this marshmallow-based diet to help GLOBE readers lose up to a pound a day." Barr Affidavit, Exhibit 3. GLOBE rewrote this sentence to read, "Together with Diane Nelson, a nutritionist with the Bureau of Nutrition,

the following marshmallow diet was prepared." Wade Affidavit, Exhibit 1. Neither this passage nor the remainder of the article contains substantive changes from Wade's copy. Indeed, the article expresses nothing that is not expressed in Wade's draft. Editorial rewriting, which is intended to attract and retain the reader's eye and to summarize the contents of an article, does not amount to an endorsement of the article or an adoption of it as one's own. *Herbert v. Lando*, 596 F.Supp. 1178, 1230 (S.D.N.Y.1984) (discussing addition of introductory streamer, inclusion of graphics, and editing of concluding paragraph). *Cf. Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 960 (D.D.C.1976) (Plaintiff argued that rewriting made the article its own. The court stated, "Plaintiff cannot seriously contend that the Star rewrote the entire article, since, aside from the addition of several paragraphs, editing was limited to improving style and did not result in substantive changes.").

█ Nor do GLOBE's editorial changes demonstrate gross irresponsibility. GLOBE's editing is no evidence of irresponsibility, much less gross irresponsibility. Because no genuine issue of fact exists as to whether the defendant was grossly irresponsible in publishing the statements concerning the plaintiff, the defendant's motion for summary judgment on the plaintiff's first cause of action is granted.

### B. The Privacy Claim

The plaintiff's second cause of action arises under sections 50[7] and 51 of the New York Civil Rights Law. N.Y. Civ. Rights Law §§ 50, 51 (McKinney 1976). Section 51 provides a cause of action for injunctive relief and damages where a person's name, portrait, or picture is used, without that person's consent, for advertising purposes, or for purposes of trade.[8]

This provision, which, if read literally, would provide an extremely broad cause of action applicable to virtually all uses of a person's name or picture, including use by the news media, has been narrowly construed by the courts, especially in the context of persons denominated "public figures," so as "to avoid any conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest" guaranteed by the First Amendment.

*Ann-Margret v. High Society Magazine, Inc.*, 498 F.Supp. 401, 404 (S.D.N.Y.1980) (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 382, 87 S.Ct. 534, 539, 17 L.Ed.2d 456 (quoting *Spahn v. Julian Messner, Inc.*, 18 N.Y.2d 324, 274 N.Y.S.2d 877, 879, 221 N.E.2d 543, 545 (1966)). This narrow construction extends to the trade purposes prong of the statute, which the plaintiff contends applies herein. With two exceptions, that prong may not be used to prevent or penalize comment on "matters in which the public has a right to be informed." *Lerman v. Flynt Distributing Co., supra*, 745 F.2d at 131. Such matters are to be "freely defined." *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 449 N.Y.S.2d 941, 944, 434 N.E.2d 1319, 1322

---

**7.** Section 50 provides criminal penalties for the use of a person's name, picture or likeness for advertising or trade purposes. It states,

A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor.

N.Y.Civ. Rights Law § 50 (McKinney 1976). Because the provisions of section 50 are incorporated in section 51, reference will be made only to section 51.

**8.** Section 51 states,

Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without [his] written consent ... may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner ... the jury in its discretion may award exemplary damages.

New York Civ. Rights Law § 51 (McKinney Supp.1983).

(1982). They include news of "entertainment and amusement, concerning interesting phases of human activity in general." *Ann-Margret v. High Society Magazine, Inc., supra,* 498 F.Supp. at 405. Matters of health, nutrition, and, in this case, dieting, fit within this broad formulation. *See supra* p. 976.

[A] plaintiff may still be entitled to obtain the sanctions of § 51 under the trade purposes prong even where the use is in conjunction with a report on a matter of public interest, but in order to do so must meet one of two tests. First, a plaintiff may attempt to demonstrate that the use of plaintiff's name or likeness has no real relationship to the discussion, and thus is an advertisement in disguise.

*Lerman v. Flynt Distributing Co., supra,* 745 F.2d at 131. Any contention that the use of plaintiff's name had "no real relationship" to the content of the article would be frivolous. According to the article, the plaintiff assisted in the preparation of the diet that is its subject.

Alternatively, a plaintiff may claim that defendant forfeited the privilege for reporting matters on which the public has the right to be informed by proving that the defendant's use was infected with material and substantial fiction or falsity....

Even when so infected, for defendant to lose the newsworthy privilege plaintiff must prove that defendant acted with some degree of fault regarding the fictionalization or falsification.

*Id.* at 132. The plaintiff's attack on the article rests on this second exception. An issue of fact remains as to substantial falsification. But the plaintiff must also establish that an issue of fact remains as to fault in order to survive the defendant's motion on the second count.

"[W]hether 'actual malice' ... need be proven in Civil Rights Law cases where the plaintiff is neither a public official nor a public figure," is an open question.[9] *Davis v. High Society Magazine, Inc.,* 90 A.D.2d 374, 457 N.Y.S.2d 308, 316 (2d Dep't 1982). We do not, however, believe it a difficult one.

A private plaintiff, like Nelson, who is neither a public official nor a public figure, *see supra* pp. 974–976, need not prove actual malice in order to recover in a substantial falsification case under the privacy act. Were courts to require a private plaintiff to prove actual malice in those circumstances, the substantial falsification exception would be rendered close to nugatory. Such an interpretation would sap helpless private plaintiffs of the protections of the statute in an area where constitutional values are often barely implicated. Not surprisingly, no court, state or federal, has applied the actual malice standard in this context to a plaintiff who was neither a public official nor a public figure.[10]

It remains to set down the degree of fault that a private individual must prove when the nonconsensual use of his name is infected with substantial falsification. Decisions of the New York Court of Appeals in the analogous defamation context provide an accurate guide. Where the article in question is newsworthy, both privacy and defamation actions implicate the public's strong interest in the discussion of public issues. Likewise, private plaintiffs in both types of actions neither assume the risk of defamation or invasion of his privacy nor are able to take effective counter

---

**9.** When substantial falsification is alleged, a public figure or public official must show that the material was published with "actual malice" in order to recover. *Meeropol v. Nizer,* 560 F.2d 1061, 1066 (2d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Spahn v. Julian Messner, Inc.,* 21 N.Y.2d 124, 286 N.Y.S.2d 832, 834, 233 N.E.2d 840, 842 (1967), *appeal dismissed,* 393 U.S. 1046, 89 S.Ct. 676, 21 L.Ed.2d 600 (1969).

**10.** Arguably, *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), a privacy act case in which the Supreme Court required a showing of actual malice, concerned an article written about non-public figures. In that case, the Court never explicitly stated that the plaintiffs, a family thrust into the headlines after their four-day, 19-hour ordeal as hostages of three escaped convicts, were public figures. Today, those plaintiffs, who shunned the limelight, would not be considered public figures. *See supra* pp. 975–76.

measures. Given the similarity between these defamation and privacy act claims, and the absence of any additional guidance, we feel constrained to conclude that "[t]he same standards of constitutional protection apply to an invasion of privacy as to libel actions," *Meeropol v. Nizer, supra,* 560 F.2d at 1066, *cited in Lerman v. Flynt Distributing Co., supra,* 745 F.2d at 135, at least with respect to private plaintiffs. We therefore hold that in order to state a claim under section 51 of the Civil Rights Law, a private individual who is the subject of a newsworthy article must establish that errors in the article regarding him were the result of grossly irresponsible publishing practices. *Cf. Chapadeau v. Observer Dispatch, supra.* Since the plaintiff herein is unable to make that showing, *see supra* pp. 976–977, her claim under the Civil Rights law must be dismissed.

III. Conclusion

The defendant's motion for summary judgment is granted. The Clerk will enter judgment accordingly.

SO ORDERED.