HERMAN WEINER, Respondent, v DOUBLEDAY & COMPANY, INC., et al., Appellants.

First Department, December 8, 1988

APPEARANCES OF COUNSEL

*Lyman Stansky (Murray Kagel* with him on the brief), for respondent.

*Victor A. Kovner* of counsel *(Laura R. Handman* and *John Siegel* with him on the brief; *Lankenau Kovner & Bickford* and *Harriette K. Dorsen* and *Katherine Trager,* attorneys), for appellants.

## OPINION OF THE COURT

Ross, J.

We are presented, in this libel action, with the issue of whether unflattering references allegedly referring to the plaintiff, who is a practicing psychologist, which appear in a nonfiction book are defamatory or are constitutionally protected expressions of opinion.

Ms. Shana Alexander, in 1985, wrote a book entitled: Nutcracker: Money, Madness, Murder: A Family Album (book), which was published in hardcover by Doubleday & Company, Inc. (Doubleday), a New York corporation, with its principal office located in New York County.

The book purports to be a nonfiction account of the widely publicized slaying of multimillionaire Mr. Franklin Bradshaw (Mr. Bradshaw) in 1978, in Salt Lake City, Utah. Mr. Bradshaw was shot to death by his then 17-year-old grandson, Mr. Marc Schreuder, who claimed in a confession that he was following the orders of his then 40-year-old mother, Ms. Frances Bradshaw Schreuder (Ms. Schreuder), who was the daughter of the victim. Both Mr. Marc Schreuder and Ms. Schreuder were convicted of that murder.

Over the course of this 444-page book, Ms. Alexander explores the history of emotional disturbance in the late Mr. Bradshaw's family, and the author particularly deals with the influences that contributed to the development of the personality of Ms. Schreuder. According to the book, Ms. Schreuder was a disturbed individual who, *inter alia,* alienated various members of the Bradshaw family, as a result of her life-style, which included alleged child neglect, promiscuous affairs, social climbing, attempted suicide, and addiction to sedatives.

Discussed in the book are Ms. Schreuder's two stormy marriages, which both ended in divorce. First, in 1959, she married Mr. Vittorio Gentile, with whom she had two sons, one of whom was Mr. Marc Schreuder, and then, after that marriage ended, Ms. Schreuder in 1969 married Mr. Frederick Schreuder, with whom she had a daughter.

Our examination of the book indicates that, during the acrimonious divorce proceeding between Ms. Schreuder and Mr. Gentile in the mid-1960's, which, *inter alia,* involved the custody of their two sons, who were then pre-teen-agers, several members of the Bradshaw family believed that Ms. Schreuder was an unfit mother. However, at that divorce trial, Dr. Herman Weiner (Dr. Weiner), a licensed psychologist, who was then treating Ms. Schreuder as a patient, testified as her witness that she was a fit mother.

Although this book was published almost 20 years after the divorce proceedings, mentioned *supra,* the mother of Ms. Schreuder, Mrs. Berenice Bradshaw (Mrs. Bradshaw), who was the widow of the slain man, as well as Ms. Schreuder's sister, Mrs. Marilyn Reagan (Mrs. Reagan) and Mrs. Reagan's husband, Robert Reagan (Mr. Reagan), still expressed antagonism towards Dr. Weiner for his testimony on behalf of Ms. Schreuder.

The only references in the book to Dr. Weiner are contained in two paragraphs, which begin on page 110 and end on page 111. Those paragraphs read, as follows:

"In 1966 Frances put herself for two years under the care of a Park Avenue psychiatrist named Herman Weiner, who seems to have encouraged his patient to stand up to her overprotective mother. Berenice was attempting to infantilize her, Frances decided. She told Marc that Granny had a neurotic need for 'babies to smother,' which could account for Berenice's intense dislike of the man she began to habitually refer to as 'Weenie, the big, fat, ugly Jew.'

"Robert Reagan remembers Dr. Weiner arriving in court to testify for Frances, during the divorce proceedings, eccentrically costumed in bright red slacks and a loud plaid jacket. Marilyn Reagan remembers the size of one of his bills: Frances owed her psychiatrist $3,000. 'My understanding was that her problem was inability facing reality,' says Marilyn. The huge unpaid bill made her sister think it might be the psychiatrist who had this problem, not his patient. Later, when Behrens claimed that 'Francis always slept with her

shrinks,' the Reagans said they were not at all surprised. They'd suspected 'hanky panky,' they confessed. Berenice has said the same."

Based on those two paragraphs, in 1985 Dr. Weiner (plaintiff) commenced, in the Supreme Court, New York County, a libel action against Ms. Alexander and Doubleday (defendants), and in that action he sought to recover damages in the amount of one million dollars, since he claims his personal and professional reputation has been adversely affected. The complaint alleges, in substance, that "the defamatory words attributed [in the two subject paragraphs, set forth *supra*] to Berenice, Behrens and the Reagans were accepted by defendants as factual, without investigation, verification or validation, without affording plaintiff, whose name, address and telephone number appeared in available telephone and professional listings, a fair opportunity to respond to said accusations".

When, in 1983, Ms. Alexander started to work on her book, she had almost 40 years' experience as an investigative journalist and author. In the course of preparing to write this book, Ms. Alexander was assisted by Mr. Alex Dubro, who was a professional researcher and writer, who was recommended to her by the Center for Investigative Reporting in San Francisco, and who, at the time of his participation in this book project, had approximately 15 years' experience as a journalist. Mr. Dubro, *inter alia*, had provided investigative services for the President's Commission on Organized Crime and the United States Senate Permanent Subcommittee on Investigations.

Following the joinder of issue, the plaintiff moved and the defendants jointly cross-moved for summary judgment. The IAS court granted the plaintiff's motion, denied the defendants' cross motion, and set the matter down for an assessment of damages.

In an affidavit, dated November 3, 1987, which was submitted in support of defendants' joint cross motion, Ms. Alexander stated: "Mr. Dubro and I spoke to approximately 250 different sources [in preparing the book]. All of the statements that plaintiff complains of in this action were based upon information that Mr. Dubro and I obtained during certain of these personal interviews". Furthermore, in this affidavit, Ms. Alexander identified the person named "Behrens", who was quoted in the second paragraph of the material complained of

by plaintiff, as "Richard Behrens [Mr. Behrens] * * * a close friend of Frances Schreuder".

After review of the two paragraphs in issue, we find there are two types of allegedly libelous statements contained in them about plaintiff, which were made by persons who are named by the author and interviewed by Ms. Alexander and Mr. Dubro.

While the first type deals with belittling opinions of the plaintiff, such as that he was a "big, fat, ugly Jew", and that, when he testified in the divorce trial, plaintiff was "eccentrically costumed in bright red slacks and a loud plaid jacket", the second type deals with expressions of opinions, which might injure plaintiff's personal and professional reputation, since they implied plaintiff overcharged his patients and slept with them.

The Court of Appeals held in *Aronson v Wiersma* (65 NY2d 592, 593-594 [1985]), "[w]hether particular words are defamatory presents a legal question to be resolved by the court in the first instance *(Tracy v Newsday, Inc.,* 5 NY2d 134; *Sprecher v Dow Jones & Co.,* 88 AD2d 550, *affd* 58 NY2d 762)".

We decided in *Parks v Steinbrenner* (131 AD2d 60, 62 [1st Dept 1987]) that statements of pure opinion "even if false and libelous, and no matter how perjorative or pernicious they may be * * * are safeguarded and may not serve as the basis for an action in defamation. *(Steinhilber v Alphonse,* 68 NY2d 283, 289; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 380-381, *cert denied* 434 US 969.)"

In *Gertz v Robert Welch, Inc.* (418 US 323, 339-340 [1974]), the United States Supreme Court held: "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas".

Chief Judge Wachtler wrote, in a recent opinion for the Court of Appeals, in *People ex rel. Arcara v Cloud Books* (68 NY2d 553, 557-558 [1986]), that: "New York has a long history and tradition of fostering freedom of expression, often tolerating and supporting works which in other States would be found offensive to the community * * *. Thus, the minimal national standard established by the Supreme Court for First Amendment rights cannot be considered dispositive in determining the scope of this State's constitutional guarantee of freedom of expression".

■ Although we disapprove Mrs. Berenice Bradshaw's de-

rogatory reference to plaintiff as a "big, fat, ugly Jew", we find that it is a mere epithet, and in this State there can be no action for libel based upon opinion, expressed in the form of epithets. For example, in *Steinhilber v Alphonse* (68 NY2d 283, 287 [1986], *supra),* it was held that the description of the plaintiff, who was employed by the New York Telephone Company, in Saugerties, New York, as "Louise the scab, years ago, she was an unknown failure. Now she is a known failure. She lacks only three things to get ahead, talent, ambition, and initiative" was not actionable; and, in *Parks v Steinbrenner (supra,* at 61), we held not actionable, as an expression of pure opinion, the assertion by an owner of a baseball team that the plaintiff, a professional Major League baseball umpire, was "not a capable umpire. He is a member of one of the finest crews umpiring in the American League today, but obviously he doesn't measure up".

Furthermore, we find Mr. Reagan's unflattering comment that plaintiff, when he testified in the divorce/custody case, discussed *supra,* was "eccentrically costumed in bright red slacks and a loud plaid jacket" and Mrs. Reagan's opinion that plaintiff overcharged his patients, to be expressions of pure opinion, and, therefore, not actionable *(see, Steinhilber v Alphonse, supra; Parks v Steinbrenner, supra).* We note in passing that plaintiff, himself, in his deposition, agreed that his $3,000 bill was fairly sizeable.

Turning now to the references in the subject second paragraph that implies plaintiff slept with Ms. Schreuder, our review of the record before us indicates that, before placing them in the book, Ms. Alexander did substantial research.

Ms. Alexander's associate, Mr. Dubro, submitted an affidavit, dated November 9, 1987, in support of the defendants' joint cross motion. In that affidavit, he stated: "[t]he statement that 'Frances [Schreuder] always slept with her shrinks' was volunteered by Mr. Behrens during one of my interviews. Because of his close personal relationship with Frances, I had no reason to doubt that he was privy to this information, nor to doubt the veracity of his recall".

Moreover, Ms. Alexander stated, in her own affidavit, mentioned *supra,* in pertinent part:

"Alec Dubro interviewed Mr. Behrens on three different occasions and considered him to be a reliable source. * * * Furthermore, when I wrote the book, I also had in hand the text of an interview I had conducted with Kathy Livingstone,

an editor at *Town and Country* magazine, who was a friend of both Behrens and Frances Schreuder. Ms. Livingstone said that Behrens had also told her that Frances 'always slept with her shrinks'. (Copies of my notes of this interview are annexed hereto as Exhibit 'C'.) * * *

"As the book recounts, the Reagans told me in the course of a personal interview that they had 'suspected hanky-panky' between the plaintiff and Frances Schreuder. (See Exhibit 'B' hereto) In my interview with Berenice Bradshaw (Frances' mother), she independently told me of her belief that the plaintiff had a sexual relationship with Frances. (See Exhibit 'A' hereto). In light of these four separate reports, Mr. Dubro and I had no reason to doubt the accuracy of the statement as published".

It has been held that a reporter's misplaced reliance on sources does not in and of itself "demonstrate gross irresponsibility, even though the report given * * * later [proves] to be inaccurate" *(Robart v Post-Standard,* 74 AD2d 963 [1980], *affd* 52 NY2d 843 [1981]; *and see, Gaeta v New York News,* 62 NY2d 340, 351 [1984]).

■ Although, based on our examination of the facts, we find that "plaintiff is a 'private' individual, the subject matter of the * * * [book] in issue is unquestionably a matter 'within the sphere of legitimate public concern' [, since the book dealt with the emotional turmoil in the family of a well-publicized murder victim]" *(Karaduman v Newsday, Inc.,* 51 NY2d 531, 539 [1980]). In order for a publisher such as defendant Doubleday to avoid liability in this defamation action, it must not have "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" *(Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199 [1975]). The Court of Appeals decided in *Rinaldi v Holt, Rinehart & Winston* (42 NY2d 369, 382-383 [1977], *supra)* that a book publisher can rely upon the reportorial skills of the author of a book, and we find no persuasive evidence in this record which indicates Doubleday "had, or should have had, substantial reasons to question the accuracy of the [material contained in the subject paragraphs] or the *bona fides* of its [author]" *(Rinaldi v Holt, Rinehart & Winston, supra,* at 383).

Furthermore, we find in the instant record convincing evidence that Doubleday carefully reviewed the book before its publication. Mr. James Moser, who was employed by Double-

day and who edited this book for them, stated, in an affidavit, dated November 6, 1987, which was submitted in support of the defendants' joint cross motion, in pertinent part:

"Throughout the Book's preparation, I was in regular contact with the author, making editorial suggestions, as well as questioning her about statements Doubleday believed might be problematic from a legal standpoint. I knew that the facts set forth in the Book were largely drawn from her personal interviews with family members and close friends of the Book's subject—Frances Schreuder. * * *

"Any material that could possibly raise the issue of libel * * * was reviewed by Doubleday's legal department. As it generally does when publishing non-fiction crime books of this kind, Doubleday also sent the manuscript to outside counsel, who are recognized as specialists in the law of libel. The outside law firm read the manuscript and suggested that the author supply the substantiation for certain statements appearing therein. After this internal and outside review, a member of Doubleday's legal department met with Alexander and was satisfied with the substantiation that she provided".

We cite, with approval, the following language from the United States Court of Appeals, First Circuit, in *Geiger v Dell Publ. Co.* (719 F2d 515, 518 [1st Cir 1983]), "To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man. This result would, we think, produce just such a chilling effect on the free flow of ideas as First Amendment jurisprudence has sought to avoid". In other words, based upon the careful review undertaken herein by Doubleday of the book's contents, we find there was no further obligation imposed by the law upon that publisher to reresearch the book.

As mentioned *supra,* the plaintiff in his complaint chides the defendants for not contacting him. Our review of legal authority indicates there was no duty upon the defendants to include a denial from the plaintiff in the book. Moreover, in view of the fact that plaintiff was bound by the obligations of confidentiality imposed by the psychologist-patient privilege (CPLR 4507), the defendants had no reason to anticipate plaintiff would discuss the details of his relationship with Ms. Schreuder with them.

We find that this book did not attempt to substantiate or refute everything that was said about Ms. Schreuder; but,

rather, it endeavored to expose the internecine rivalries and animosities that led to her downfall. In this light, the opinions expressed in the two offending paragraphs in our opinion were sufficiently confirmed for publication *(see, Geiger v Dell Publ. Co., supra).*

When the subject two paragraphs are read in the context of this 444-page book, we find that the disparaging references to the plaintiff in those paragraphs are presented as pure opinions and not as facts. For example, the paragraphs appear in a section of the book, which is introduced by this warning statement from author, Ms. Alexander, that *(see,* page 105 of the book): "Details of Frances's [Ms. Schreuder's] domestic existence must of necessity be reconstructed from the recollections of other members of her always carefully locked and guarded household: children, ex-husbands, ex-servants, Behrens, and Berenice—her only visitors. *Not the best of sources in any circumstances"* (emphasis supplied).

We find the purpose of this statement, quoted *supra,* is to caution the reader that the author is explicitly disclaiming the factual nature of the perceptions about Ms. Schreuder expressed in those two paragraphs by family members and Mr. Behrens. Besides this warning, Ms. Alexander gives other similar warnings to the reader, such as "if Behrens can be believed" *(see,* page 171 of the book); and, "Whom and what does one believe in this family?" *(See,* page 129 of the book.) Cautionary passages like these, which are sprinkled throughout the book, in our view, indicate that the opinions of the family members and of Mr. Behrens were presented simply as nothing more than opinion, since "when the reasonable reader encounters cautionary language, he [or she] tends to 'discount that which follows' " *(Ollman v Evans,* 750 F2d 970, 983 [DC Cir 1984] [en banc], *cert denied* 471 US 1127 [1985]).

The Court of Appeals in *Steinhilber v Alphonse (supra,* at 292) cites with approval the case of *Ollman v Evans (supra)* for its discussion of four factors, which should be used "in differentiating between fact and opinion. The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable cus-

toms or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact' *(Ollman v Evans, supra,* at 983; *see,* discussion of four factors, *id.,* at pp 978-984)". Applying those four factors to the text in the book before us, we conclude that the commentary contained in the two subject paragraphs were unequivocally opinions and not facts. Expressions of opinion are absolutely protected by the First Amendment of the United States Constitution *(see, Gertz v Robert Welch, Inc., supra,* 418 US, at 339).

In *Janklow v Newsweek, Inc.* (778 F2d 1300, 1306 [8th Cir 1986], *cert denied* 479 US 883 [1986]), the United States Court of Appeals, Eighth Circuit, warned that "Courts must be slow to intrude into the area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government".

Although plaintiff claims that he has been damaged by the defendants' acts, he presents no evidence of that damage, except for his own affidavit. Further, plaintiff has not even submitted an affidavit from any objective third party indicating that he or she read the language in suit and believed that plaintiff had sexual relations with Ms. Schreuder or any other patient or thought less of plaintiff as a result. Significantly, plaintiff in his deposition limited his damages when he stated "I'm not making a claim for loss of income from any practice due to the libel in the book".

In summary, we find that the material about the plaintiff set forth in the subject two paragraphs was responsibly researched by the defendants and are expressions of opinion made by persons interviewed by Ms. Alexander and/or Mr. Dubro. As was stated by the United States Supreme Court in *Gertz v Robert Welch, Inc. (supra,* at 340): "Our decisions recognize that a rule of strict liability that compels a publisher * * * to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties".

Based upon our analysis *supra,* we find that "[p]laintiff has not raised a triable issue as to whether defendants 'acted in a

grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.' *(Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199, *supra.)" (Gaeta v New York News, supra,* 62 NY2d, at 351.) Furthermore, we find that the IAS court erred when it granted plaintiff's motion for summary judgment, and denied defendants' joint cross motion for the same relief to dismiss the complaint. Finally, we find that, since plaintiff, based upon the record before us, has failed to raise a triable issue of fact that his reputation has been injured or that the defendants acted with malice, he "may not recover on a claim of a defamation" *(France v St. Clare's Hosp. & Health Center,* 82 AD2d 1, 4 [1st Dept 1981], *appeal withdrawn* 56 NY2d 593 [1982]). Therefore, "we see no reason to deprive the defendant of the ordinary remedy of summary judgment when an insufficient showing has been made in opposition to the motion. Indeed, we must not be reluctant to apply the ordinary rules governing summary judgment in libel cases such as this" *(Karaduman v Newsday, Inc., supra,* 51 NY2d, at 545).

Accordingly, order, Supreme Court, New York County (Louis Grossman, J.), entered January 11, 1988, which granted plaintiff's motion for summary judgment and denied defendants' joint cross motion for summary judgment, is unanimously reversed, on the law and on the facts, plaintiff's motion is denied, and defendants' joint cross motion for summary judgment is granted, and the complaint is dismissed, without costs.

MURPHY, P. J., ASCH, ROSENBERGER and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on January 11, 1988, unanimously reversed, on the law and on the facts, plaintiff's motion is denied, and defendants' joint cross motion for summary judgment is granted, and the complaint is dismissed, without costs and without disbursements.