OPINION OF THE COURT
Kaye, J.
The pivotal issue in this libel action, brought by a plaintiff who is not a public figure against the author and publisher of a nonfiction book, is whether defendants’ investigation of allegedly defamatory statements was sufficient to shield them from liability, or whether they "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196,199.)
Defendant Shana Alexander, a well-known journalist, wrote a book entitled "Nutcracker: Money, Madness, Murder: A Family Album,” published by codefendant Doubleday & Company. "Nutcracker” is a nonfictional exploration of the Salt Lake City murder of Mormon multimillionaire Franklin Bradshaw, a murder which Bradshaw’s then 17-year-old grandson Marc Schreuder was convicted of committing. At a subsequent trial, based on Marc Schreuder’s testimony, his mother— Franklin Bradshaw’s daughter — Frances Bradshaw Schreuder, *591 was convicted of planning the murder and dispatching Marc to carry it out.
Although "Nutcracker” attempts to reconstruct the murder and surrounding events, the book is more than a blow-by-blow account of the crime. Rather, it purports to be a searching inquiry into the Bradshaw family’s history of emotional disturbance, with particular focus on family influences in the formation of Frances Schreuder’s personality. Schreuder is portrayed as a person whose deep emotional disturbances were manifested in varied extreme forms, including child abuse, persistent lying and two stormy, broken marriages. The primary sources of Alexander’s psychological portrait are the other members of the extended Bradshaw family and Richard Behrens, Frances Schreuder’s only friend and confidant during much of the period covered by the book.
The statements that give rise to this defamation action appear in a section of "Nutcracker” that is prefaced as follows: "Details of Frances’s domestic existence must of necessity be reconstructed from the recollections of other members of her always carefully locked and guarded household: children, ex-husbands, ex-servants, Behrens and Berenice [Schreuder’s mother] — her only visitors. Not the best of sources in any circumstances, especially these”. Sevéral pages later appear the two paragraphs that contain the book’s only reference to plaintiff:
"In 1966 Frances put herself for two years under the care of a Park Avenue psychiatrist named Herman Weiner, who seems to have encouraged his patient to stand up to her overprotective mother. Berenice was attempting to infantilize her, Frances decided. She told Marc that Granny had a neurotic need for 'babies to smother,’ which could account for Berenice’s intense dislike of the man she began to habitually refer to as 'Weenie, the big, fat, ugly Jew.’
"Robert Reagan remembers Dr. Weiner arriving in court to testify for Frances, during the divorce proceedings, eccentrically costumed in bright red slacks and a loud plaid jacket. Marilyn Reagan remembers the size of one of his bills: Frances owed her psychiatrist $3,000. 'My understanding was that her problem was inability facing reality,’ says Marilyn. The huge unpaid bill made her *592 sister think it might be the psychiatrist who had this problem, not his patient. Later, when Behrens claimed that 'Frances always slept with her shrinks,’ the Reagans said they were not at all surprised. They’d suspected 'hanky panky,’ they confessed. Berenice has said the same.”
Plaintiff contends that the sentence "Frances always slept with her shrinks,” read in the context of the rest of the paragraph, defamed him, as it falsely accused him of having sexual relations with his patient.*
In response, defendants contend that the challenged statements are simply not specific enough to be defamatory and, in any event, are a constitutionally protected expression of "opinion” as to which no claim of defamation will lie. Alternatively, defendants argue that the statements concern a subject "reasonably related to matters warranting public exposition” (Chapadeau v Utica Observer-Dispatch, 38 NY2d, at 199, supra), and that plaintiff has failed to demonstrate — as he must to prevail on a claim of defamation with respect to such subject matter — that defendants acted without due consideration for responsible standards of information gathering and dissemination (id.). Reversing the trial court, which had directed summary judgment for plaintiff on the issue of liability, the Appellate Division granted defendants’ joint cross motion for summary judgment and dismissed the complaint, on the basis of all three somewhat inconsistent grounds asserted by defendants (142 AD2d 100). We now affirm, on the last ground alone.
At the outset, we reject defendants’ contention that under common law, the challenged statements are not susceptible of the defamatory meaning ascribed to them by plaintiff. Whether the contested statements are reasonably susceptible of a defamatory connotation is in the first instance a legal determination for the court. In analyzing the words in order to make that threshold decision, the court must not isolate them, but consider them in context, and give the language a natural reading rather than strain to read it as mildly as possible at one extreme, or to find defamatory innuendo at the other (see, James v Gannett Co., 40 NY2d 415, 419-420).
Applying these principles, we conclude that in this case the *593 sentence "Frances always slept with her shrinks” is reasonably susceptible of a defamatory meaning. In isolation, it might be mere exaggeration or hyperbole, as defendants contend; removed from its context in the book, the confirmation by Frances’ relatives that they suspected "hanky panky” might be pure speculation. But viewing the quoted paragraphs as a whole, as we are obliged to do, the focus is not on Frances’ promiscuity in general or on her relationship with psychiatrists in general, but on plaintiff alone and his relationship with Frances. Contrary to defendants’ claim, it is not so unmistakably clear that the sole purpose of these paragraphs is to demonstrate the hostility of Frances’ family and Behrens toward the psychiatric profession that a more specific defamatory connotation may not also be understood.
We next turn to defendants’ claim under the First Amendment to the Federal Constitution. It is settled that expressions of opinion, in contrast to assertions of fact, are privileged and, however offensive, may not be the subject of an action for defamation (Steinhilber v Alfonse, 68 NY2d 283). Defendants argue that this protection applies to the language singled out by plaintiff.
According to defendants, Alexander’s method in assembling the "family album” was simply to recount the memories of those close to Schreuder, often in their own words, and to present sometimes conflicting points of view without necessarily attempting to reconcile them. Defendants characterize the book as "a kaleidoscope of often uncertain impressions”. This indeed is an accurate description of Alexander’s technique; at several points she casts doubt on the accuracy and veracity of her informants. The resulting document, of a sort not entirely unfamiliar to readers of "true crime” accounts, is a hybrid genre. Largely a pastiche of statements by interviewees who are unendorsed and at times openly disparaged by Alexander herself, it eludes ready classification as "fact” or "opinion.”
Defendants’ efforts to fit the challenged statements into the protected "opinion” classification are predicated upon the peculiar genre of the work. In essence, defendants contend that because the statements merely summarize the contents of interviews with third persons, and because Alexander herself lends no authorial endorsement to the statements of Behrens and the Bradshaw family (and in fact elsewhere suggests that the reader might be well advised to reserve a measure of skepticism for their judgments), the average reader would be *594 disinclined to assume that "Frances always slept with her shrinks” was an accurate statement of fact. Therefore, the argument concludes, inasmuch as the universe of libel law is divided into "fact” and "opinion,” the statements must be "opinion.”
As literary criticism, defendants’ claim may be unassailable. As a statement of law, it is problematic. We are not unmindful that the technique employed by Alexander is a popular one, and that presentation of the unedited statements and views of the subjects of a documentary work may be integral to the author’s purpose, as Alexander states (see, e.g., Price v Viking Penguin, 881 F2d 1426, 1444-1445 [8th Cir]). That Alexander’s voice can be separated from the voice of her subjects does not, however, necessarily transform their otherwise factual assertions into her "opinion.” Indeed, in Hogan v Herald Co. (58 NY2d 630, affg 84 AD2d 470, 476-480 [Simons, J.]), we rejected a claim that a "neutral reporting” privilege should be extended to a newspaper that published an objective report of newsworthy charges with proper attribution to sources. While the defendants in that case did not frame their contention in terms of "opinion,” the protection sought differed little from that asserted by defendants here — a privilege to repeat the statements of third parties so long as no endorsement was given.
The "fact/opinion” distinction in the law of defamation is an evolving one. As courts are increasingly sensitive to the effect of protracted litigation on the delicate balance between protection of a free press and protection of individual reputation, "opinion” has come to mean more than it does outside the libel law context (see, e.g., Immuno, AG. v Moor-Jankowski, 74 NY2d 548 [decided today]; Price v Viking Penguin, 881 F2d 1426, supra; Ollman v Evans, 750 F2d 970 [DC Cir], cert denied 471 US 1127).
We leave for another day, however, the question whether "opinion” protection should be enlarged to encompass the type of work that is the focus of the present controversy. Defendants have merely insisted that the challenged statements must be deemed opinion as a matter of settled law, and we conclude that this argument should be rejected. Important though it is to eschew rigidity in the area of First Amendment concerns, on this record of briefing and argument we have no basis for considering any alteration in the sensitive policy balance that has been struck to date. Instead, we move to the *595 third ground urged by defendants — the adequacy of their investigatory process — and on this ground we conclude that they must prevail.
 We agree with the Appellate Division that the challenged statements were sufficiently confirmed for publication. Preliminarily, we are satisfied that the standard to be applied in determining defendants’ liability is that set forth in Chapadeau v Utica Observer-Dispatch (supra). In Chapadeau, we held that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition,” the defamed party must establish "that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.” (38 NY2d, at 199, supra.)
We are únpersuaded by plaintiff’s contention that a simple negligence standard should govern. Plaintiff does not dispute that the general subject of "Nutcracker” falls within the Chapadeau guidelines, but argues that the particular topic of his relationship with Frances Schreuder is a detour from legitimate public concern into the realm of mere gossip and prurient interest. This is precisely the sort of line-drawing that, as we have made clear, is best left to the judgment of journalists and editors, which we will not second-guess absent clear abuse (Gaeta v New York News, 62 NY2d 340, 349). "Nutcracker” is, in part, clearly intended as an inquiry into the failure of family and professional figures to halt the progression of Schreuder’s illness before it resulted in murder. Her relationship with plaintiff is not so remote from that subject as to constitute a clear abuse of editorial discretion.
Plaintiff has failed to come forward with evidence sufficient to raise a triable issue of fact as to whether defendants satisfied their duty of care under Chapadeau.
As to defendant Doubleday, as the Appellate Division noted, citing Geiger v Dell Publ. Co. (719 F2d 515 [1st Cir]), to require a publisher to do original research with respect to every potentially defamatory reference would impose undue financial burden (142 AD2d, at 107). We have held that without "substantial reasons” to doubt the accuracy of the material or the trustworthiness of its author, a publisher is entitled to rely on the research of an established writer (Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 382-383, *596 cert denied 434 US 969; see also, Karaduman v Newsday, Inc., 51 NY2d 531, 551). Doubleday both relied on Alexander, whose experience and reputation are unquestioned, and conducted its own review of the contents of the book. The circumstances of this case did not require it to go further in order to meet its obligation under Chapadeau.
That burden was also met by defendant Alexander. She employed an experienced researcher, who several times interviewed Behrens. Alexander herself interviewed the Reagans and Berenice Bradshaw, the only other people likely to be at all familiar with Frances Schreuder’s "carefully locked and guarded household.” The challenged paragraphs accurately summarize the statements made to Alexander and her researcher. Plaintiff does not dispute that Behrens was Frances Schreuder’s confidant during the period she was in treatment with plaintiff, and knowledgeable about the details of Schreuder’s personal life. This was additionally demonstrated by Behrens’ testimony at Schreuder’s trial, which revealed his intimate knowledge of her life.
The independent views of the Reagans and Berenice Bradshaw tended to corroborate Behrens’ statements. More importantly, the accuracy of the statement was further confirmed by the fact that a friend of both Schreuder and Behrens who was interviewed recalled that Behrens had earlier related the same information to her. In short, reasonable confirmation of the statement was obtained, given the narrow circle of people whom it would have been productive to question.
Accordingly, no triable issue having been raised as to defendant’s gross irresponsibility, the Appellate Division’s order awarding summary judgment to defendants should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order affirmed, with costs.

 In his original complaint, plaintiff claimed that other portions of the two paragraphs were also defamatory, but he does not press those claims on this appeal.