John CHAIKEN and Marilyn
Chaiken, Plaintiffs,

v.

VV PUBLISHING CORPORATION d/b/a
The Village Voice, Defendant.

No. 91 Civ. 2102 (SAS).

United States District Court,
S.D. New York.

Oct. 18, 1995.

Elizabeth A. McNamara, Lankenau Kovner & Kurtz, New York City, for defendant VV Publishing Corporation d/b/a The Village Voice.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs John and Marilyn Chaiken sue Defendant VV Publishing Corporation d/b/a *The Village Voice* ("*Voice*") for libel and intentional infliction of emotional distress arising from a 1985 article published in the *Voice*, a weekly New York newspaper. The case was originally filed by the Chaikens in Massachusetts state court in 1988 against four defendants: the *Voice*, Robert I. Friedman—the author of the article—Modiin Publishing House d/b/a Maariv ("Maariv"), and Ron Dagony. Maariv, an Israeli newspaper, had also published an article written by Dagony which included excerpts from the *Voice* article. After the Defendants removed the case to Massachusetts federal court, the court granted Maariv's and Dagony's motions to dismiss for lack of personal jurisdiction. In March, 1991, the case was transferred to the Southern District of New York. Judge John F. Keenan subsequently dismissed the Complaint against Friedman because New York's one year limitations period for defamation claims had expired. *See Chaiken v. VV Publishing Corp.*, 1991 WL 177269, *2–3 (S.D.N.Y. Sept. 4, 1991) (Keenan, J.). After an extensive and often bitter discovery period before three District Judges and two Magistrate Judges, the *Voice* now moves for summary judgment on Plaintiffs' remaining libel and intentional infliction of emotional distress claims.

## BACKGROUND

Many of the relevant facts are not disputed.[1] The Chaikens are American emigres who relocated to Israel from Boston in 1984. After a brief stay at an absorption center, the Chaikens moved to Hebron. Hebron is located on the West Bank and is a hotbed of Arab–Israeli conflict.[2] The Chaikens decided to live in Hebron "because it is a very spiritual thing to be able to live a five minute walk from the second holiest place in the world to the Jewish people." Deposition of Marilyn Chaiken, September 6, 1993 ("M. Chaiken Dep."), at pp. 54–55. In 1990, John Chaiken was diagnosed with a brain tumor, and he passed away in 1991. Marilyn Chaiken remains in Hebron, where she lives with their eight children.

The *Voice* is a weekly newspaper published by VV Publishing Corporation, a New York corporation. The *Voice* publishes articles on a broad·spectrum of topics, including politics, culture, and lifestyle. In 1985, over 81% of its total U.S. circulation of 147,000 was in the New York metropolitan area, while 2% was in Massachusetts. *See* Affidavit of David A. Schneiderman, President and Publisher of the *Voice*, dated December 23, 1994 ("Schneiderman Aff."), at ¶¶ 6, 8, 10.

### A. *Friedman's Relationship With The Voice*

In 1983, Friedman met with David Schneiderman, who was then Editor-in-Chief and Publisher of the *Voice*. Friedman provided Schneiderman with information about his professional background and accomplishments, which included six articles published in a number of leading newspapers. *See id.* at Exs. 1–6. Friedman's work impressed Schneiderman, who commissioned Friedman to write articles for the *Voice*. Between 1983 and 1985 Friedman wrote eight articles for the *Voice*. Schneiderman found this work, which included Friedman's "coup" in obtaining an exclusive interview with Yassir Arafat, to be thorough and impressive. *See id.* at ¶ 14. At the time the article at issue in this case was published, no article written by Friedman—at the *Voice* or elsewhere—had been the subject of a lawsuit. *See* Friedman Aff. at ¶ 19.

Although Friedman's status at the *Voice* is the subject of great dispute between the parties, the evidence submitted by the *Voice* is almost wholly uncontradicted. Friedman did not have a written contract with the *Voice* and was only paid for assigned articles on submission. In addition, he was not assigned specific topics by the *Voice;* rather, he would propose an idea to a senior editor, who would either approve or disapprove Friedman's choices. If the *Voice* decided not to publish an article, Friedman would receive a "kill-fee," which was typically between 25% and 50% of the full fee. *See* Schneiderman Aff. at ¶ 17. Friedman was free to propose articles or ideas to publications other than the *Voice*, and he did receive income from other literary sources between 1983 and 1985.[3] *See* Friedman Aff. at ¶ 15. In addition, Friedman received no fringe benefits from the *Voice*, had no taxes withheld, was not provided with an office, and was not listed on the masthead of the *Voice* as a "staff writer." *See* Schneiderman Aff. at ¶¶ 17–22.

### B. *The Article*

In the Spring of 1985, the *Voice* approved Friedman's proposal to write an article about an upcoming trial of members of the "Jewish underground" who had committed acts of violence against West Bank Arabs, and the ideological and financial support provided to

---

1. Although Plaintiffs' Rule 3(g) statement denies almost every fact asserted by the *Voice*, numerous facts are only "denied" as "beyond the knowledge" of the Chaikens.

2. Hebron has had a long history of conflict between Jews and Palestinian Arabs. *See* Affidavit of Robert I. Friedman, dated December 23, 1994, ("Friedman Aff."), at ¶¶ 20–25. In February, 1994, Hebron became the focus of international attention when a Jewish settler opened fire in the Cave of the Patriarchs, a Jewish and Arab religious shrine located in Hebron, killing 29 Arabs. *Id.* at ¶ 20 n. 3.

3. In addition, a portion of Friedman's research expenses for the *Voice* article at issue in this case was paid for by The Fund for Investigative Journalism, a Washington, D.C. organization that provides funding to enable journalists to do research. *See* Friedman Aff. at ¶ 35.

them by the American Jewish community. The defendants in that trial included Jews who had settled on the West Bank, army officers, and government officials.[4] Friedman then travelled to Israel to research the article. In Hebron and Kiryat Arba—the home of several suspected "underground" members—Friedman was directed to the Chaikens because they spoke English. *See* Friedman Aff. at ¶ 38. After stating that he was a *Voice* reporter researching an article on Jewish settlers on the West Bank, Friedman spent an afternoon interviewing the Chaikens. Although Friedman took notes during the interview, he did not tape-record his conversations with the Chaikens.

Friedman completed a draft of his article and submitted it to the *Voice* in the fall of 1985. A senior editor and the Editor of the *Voice* reviewed the article. Certain changes in structure and organization were discussed with Friedman, but no substantive changes were made. *See id.* at ¶ 42. Schneiderman then reviewed the article and made certain queries regarding some of the technical facts, which were verified prior to publication. *See* Schneiderman Aff. at ¶ 24. Finally, the article was copy edited to verify spellings, dates, and sources of information and underwent a legal review by the *Voice*'s outside counsel.[5] *See id.* at ¶¶ 25–26.

The resulting article was published in the November 12, 1985 edition of the *Voice* and is entitled "*In the Realm of Perfect Faith: Israel's Jewish Terrorists.*" The front cover of the *Voice* reads "*INSIDE THE JEWISH TERRORIST UNDERGROUND: How Fanatic Nationalists Are Tearing Israel Apart.*"[6] The article begins with a description of Hebron and a neighboring Jewish settlement, Kiryat Arba, and the settlers who live in those heavily fortified enclaves. The article states that about 65% of the settlers are of American origin and that "most are

fervent supporters of the major right-wing religious-nationalist organizations that dominate life on the West Bank—Gush Emunim (Bloc of the Faithful) and Rabbi Meir Kahane's avowedly anti-Arab Kach Party." These organizations "have vowed to secure and defend the West Bank at any cost."

The article then turns to the Chaikens: after providing a brief biographical sketch, it discusses their views on the settlers' right to own and live on the land to the exclusion of the Arabs. Friedman first recounts his conversation with John Chaiken. John states that Hebron is historically significant to the Jewish people and then gives a response to those who say it is unethical to force the Arabs to leave: "Western European values are bullshit. The messiah will come. There will be a Jewish kingdom. Jews will be the spiritual bosses of the world ... You can't create a messianic Jewish state with 1.9 million Arabs." John then boasts of deliberately provoking the Arabs into violence in the hope that the Israeli army would respond by driving the Arabs out of the West Bank. John tells of an incident where he and 50 other armed settlers gave John's son a ritual haircut in a Mosque during Arab prayers, and then ate watermelon and spit the seeds all over the floor.

In the next paragraph, Marilyn Chaiken states that "you have to live in the realm of perfect faith." To Marilyn, the Arab massacre of Jews in Hebron in 1929 was brought about because the Jews' "faith was imperfect, and because they had sex with Arabs." Marilyn then takes Friedman on a tour of Hebron, where she yells at and slaps an Arab child who is selling combs in front of a spot where a Jewish settler was murdered. Marilyn states "[t]he Arabs are worse than the niggers—but not by much." Friedman then

---

4. Eventually, twenty-five Jewish settlers and army officials were convicted of terrorist acts, an event which made headlines in the Israeli press. *See* Friedman Aff. at ¶ 31.

5. The Chaikens claim that the *Voice* should be estopped from relying on a review of the article by outside counsel because the *Voice* asserted attorney-client privilege regarding this review during discovery. *See* Plaintiff's Opposition Rule

3(g) at ¶ 21. However, as discussed below, the absence of a review by outside counsel would not change the Court's analysis.

6. Certain *Voice* employees composed the cover headlines for that issue of the *Voice*. *See* Friedman Aff. at ¶ 27. The inside title of the Article ("*In the Realm of Perfect Faith* ") was derived from a statement allegedly made by Marilyn Chaiken.

quotes John as stating that it is an "outrage" that the Arabs are still in Hebron.

The next paragraph is a transition to the rest of the article and states: "Settlers like the Chaikens have turned the more than 114 settlements that now dot the West Bank into hothouses for the growth of terrorism." Friedman writes that the Israeli authorities have recently uncovered six different Jewish undergrounds responsible for terrorist bombings and murders of Arabs across the West Bank. Most of these terrorist groups are affiliated with the Gush Emunim settlers movement and the Kach Party and continue to enjoy widespread support from Israeli society. Towards the end of the paragraph, an expert on West Bank affairs states "[o]ne day the settlers who support Gush Emunim or Kahane will commit an atrocity so grave that it will imperil Jews everywhere."

The article then goes on to describe various Israeli terrorist groups and profiles West Bank settlers who are involved in terrorist activities. The settlers' attempts to bomb and kill Arab residents and officials are recounted in detail. In addition, a separate article ("The American Connection"), also written by Friedman, details the American–Jewish support for organizations like Gush Emunim and the Kach Party.

## C. *The Chaikens' Response*

The Chaikens contend that the *Voice* article is replete with misrepresentations and falsehoods. On a motion for summary judgment, I assume the Chaikens' version of the events is accurate. Specifically, John claims that his comments about "Western European values" and Jews becoming the "spiritual bosses" of the world were taken out of context in order to make him appear as a "vile, crude, person." [7] Affidavit of Marilyn Chaiken, dated January 3, 1993 ("M. Chaiken Aff."), at Ex. 2 (letter from John Chaiken). John also states that Friedman's version of the ritual haircut at the Mosque was substantially changed: the mosque was located on a spot holy to the Jewish people, the settlers

waited until Arab prayers had finished, the Jewish contingent was made up of mostly women and children, and no one spit watermelon seeds onto the floor of the mosque. *Id.* Similarly, Marilyn claims that she never made the statements about the massacred settlers or slapped the Arab child in the Hebron marketplace. *See* M. Chaiken Aff. at ¶¶ 5–6. Finally, the Chaikens dispute the racist views attributed to them and contend that they have not turned the West Bank settlements into "hothouses for the growth of terrorism." M. Chaiken Aff. at Ex. 1.

Plaintiffs filed their Complaint in November, 1988. Plaintiffs allege that the *Voice* article defames them by attributing to them "criminal, vile, crude acts, and other acts holding them up to contempt and hatred." Complaint at ¶ 6. Although it is nowhere stated that the Plaintiffs are terrorists or have engaged in terrorist activity, Plaintiffs also claim that the article implies they "were terrorists and supporters of terrorists and committed assault and battery, trespass and other unjustifiable violence against others and had used unseemly, obscene language, desecrated a Moslem place of worship and otherwise held the Plaintiffs up to ridicule, contempt, and hatred ..." *Id.* at ¶ 8. As a result of the article, the Chaikens further allege that they suffered emotional distress and humiliation and were investigated by the Israeli police. *Id.* at ¶ 7.

In an Amendment to the Complaint, the Chaikens allege that the brunt of their injuries occurred in Massachusetts. On June 24, 1988, John Chaiken was stabbed in the Hebron marketplace by an Arab. The incident received coverage in the Israeli and American press. John later wrote an editorial detailing how the Arab who stabbed him had been trying to kill a settler for days. *See* Affidavit of E. McNamara, Counsel for Defendant, dated December 23, 1994 ("McNamara Aff."), at Ex. 30. The Chaikens amended their Complaint on December 18, 1992 to allege that this incident resulted from the *Voice* article, and that John's death in

---

7. The Chaikens submitted eight volumes of exhibits in opposition to Defendant's motion. Their primary contentions about the *Voice* article appear in Marilyn Chaiken's affidavit and two

attached exhibits: a copy of the article with John Chaiken's handwritten comments, and a letter written by John Chaiken in 1987.

1991 was hastened by the injuries he received in the attack.

## DISCUSSION

### I. Summary Judgment in Defamation Cases

 Federal Rule of Civil Procedure 56(c) provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may defeat a summary judgment motion by producing or pointing to sufficient specific facts to establish that there is a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). While a court must view the inferences to be drawn from the facts in the light most favorable to the non-moving party, *see Matsushita Elec. Indust. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), "mere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see also Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (mere conclusory allegations or denials in legal memoranda or oral argument cannot create a genuine issue of material fact).

In the context of a defamation claim brought under New York law[8], courts have not hesitated to grant or affirm grants of summary judgment when no genuine issue of material fact exists. *See, e.g., Naantaanbuu v. Abernathy,* 816 F.Supp. 218 (S.D.N.Y. 1993); *Nelson v. Globe International, Inc.,* 626 F.Supp. 969 (S.D.N.Y.1986); *Weiner v. Doubleday & Co.,* 74 N.Y.2d 586, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990); *Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 477 N.Y.S.2d 82, 465 N.E.2d 802 (1984). Indeed, the New York Court of Appeals has stated that courts must not be reluctant to apply the ordinary rules governing summary judgment in libel cases ... since '(t)he threat of being put to a defense of a lawsuit ... may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself.' *Karaduman v. Newsday,* 51 N.Y.2d 531, 543, 435 N.Y.S.2d 556, 416 N.E.2d 557 (1980) (citations omitted); *Immuno AG v. J. Moor-Jankowski,* 77 N.Y.2d 235, 256, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (reaffirming Court of Appeals regard for summary judgment in libel cases), *cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). With these standards in mind, I turn to the Chaikens' claims.

### II. Defamation under New York Law

 In order to make out a libel claim under New York law, a plaintiff must show that the defendant published to a third party i) a false and defamatory statement ii) which was "of and concerning" the plaintiff iii) with the requisite degree of fault—the degree of which depends on the status of the libelled party and the subject matter of the statement and iv) special harm or *per se* actionability. *See Cardone v. Empire Blue Cross and Blue Shield,* 884 F.Supp. 838 (S.D.N.Y. 1995); *Church of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp. 661, 666 (S.D.N.Y. 1991); *see generally* Restatement (Second) of Torts, § 558 at 155 (1964). The parties do not dispute that the alleged defamatory statements were published to a third party. However, I need not reach the first, second, or fourth elements of the Chaikens' defamation claims because I find that, even assuming the Chaikens' version of the article is correct, no fact issues exist regarding the *Voice*'s culpability in publishing that article.

#### A. Fault

 In the seminal case of *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d

---

**8.** The parties have stipulated that New York law governs the substantive issues in this action. *See* McNamara Aff. at Ex. 22.

196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975), the New York Court of Appeals held that

> [w]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

Thus, a twofold inquiry is required in applying the *Chapadeau* standard: first, do the defamatory statements in the *Voice* article deal with a matter of public concern?; if they do, have the Chaikens raised a triable issue of fact as to the *Voice*'s gross irresponsibility in publishing the defamatory statements in that article?

### i. *A Matter of Public Concern*

■ In determining whether defamatory statements are "reasonably related to matters warranting public exposition," a court should normally defer to the judgment of editors and journalists; "while not conclusive, 'a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is newsworthy, may be powerful evidence of the hold those subjects have on the public's attention.'" *Gaeta*, 62 N.Y.2d at 349, 477 N.Y.S.2d 82, 465 N.E.2d 802 (citation and some internal quotations omitted). Thus, a court should not second guess editorial judgments as to what constitutes a matter of public concern "absent clear abuse." *Weiner*, 74 N.Y.2d at 595, 550 N.Y.S.2d 251, 549 N.E.2d 453; *Gaeta*, 62 N.Y.2d at 349, 477 N.Y.S.2d 82, 465 N.E.2d 802 ("[E]ditorial judgments will not be second-guessed so long as they are sustainable."). In addition, defamatory statements must be viewed in the context of the article in which they appear, and not "as disembodied words, phrases, or sentences." *Gaeta*, 62 N.Y.2d at 349, 477 N.Y.S.2d 82, 465 N.E.2d 802.

■ Under these standards, the *Voice* article undeniably relates to a matter of public concern. The article details the actions of Jewish West Bank settlers who have planned and carried out attacks on their Arab neighbors. Terrorist activity is certainly a matter of public concern, especially where many of the settlers are U.S. emigres and where U.S.-based financial support is described as important to groups such as Gush Emunim and the Kach Party. Most importantly, all of the statements relating to the Chaikens must be viewed in the context of the article as a whole. The Chaikens' views about Arabs, the Jews unquestioned right to the land, and their experiences on the West Bank are intended to portray the ideology fueling the growth of Jewish terrorism. As such, the references to the Chaikens in the article are also matters of public concern. *See Gaeta*, 62 N.Y.2d at 350, 477 N.Y.S.2d 82, 465 N.E.2d 802 (statements about the experience of one mental patient in an article dealing with the transfer of 5,000 patients in mental hospitals to nursing homes relates to a matter of public concern).

### ii. *Evidence of Gross Irresponsibility*

■ A wide variety of factors may be used to determine if a statement was published "without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau*, 38 N.Y.2d at 199, 379 N.Y.S.2d 61, 341 N.E.2d 569. These factors may include:

> whether sound journalistic practices were followed in preparing the defamatory article ..., whether normal procedures were followed and whether an editor reviewed the copy ..., whether there was any reason to doubt the accuracy of the source relied upon so as to produce a duty to make further inquiry to verify the information ..., and whether the truth was easily accessible ...

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 924–25 (2d Cir.1987) (quoting *Hawks v. Record Printing & Pub. Co.*, 109 A.D.2d 972, 486 N.Y.S.2d 463, 466 (3d Dep't 1985) (citation omitted)). Moreover, numerous courts have held that a publisher who

relies upon the integrity of a reputable author and who has no substantial reason to question the accuracy of the information provided by that author cannot be held liable—even where the report is later deemed to be without any factual foundation. *See, e.g., Naantaanbuu,* 816 F.Supp. at 226–27 (quoting *Chalpin v. Amordian Press, Inc.,* 128 A.D.2d 81, 515 N.Y.S.2d 434, 439 (1st Dep't 1987)); *Nelson,* 626 F.Supp. at 976 (citing *Ortiz v. Valdescastilla,* 102 A.D.2d 513, 478 N.Y.S.2d 895, 899 (1st Dep't 1984)); *Weiner,* 74 N.Y.2d at 596, 550 N.Y.S.2d 251, 549 N.E.2d 453 (publisher is entitled to rely on the research of an established writer) (citations omitted). Indeed, unless there are "obvious reasons" to doubt the veracity of an article, a newspaper does not have the "intolerable burden of rechecking every reporter's assertions and retracing every source before proceeding [with publication]." *Karaduman,* 51 N.Y.2d at 549, 435 N.Y.S.2d 556, 416 N.E.2d 557; *see also James v. Gannett Co., Inc.,* 40 N.Y.2d 415, 423–24, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976). Finally, the *Chapadeau* standard is an objective one and may be satisfied by wholly objective proof. *See Gaeta,* 62 N.Y.2d at 350–51, 477 N.Y.S.2d 82, 465 N.E.2d 802.

█ Applying these principles to the instant case, it is obvious that the *Voice* acted responsibly in publishing the article. First, by 1985 Friedman had published at least six articles for national publications, including the *New York Times* and *Los Angeles Times. See* Schneiderman Aff. at Exs. 1–6. Between 1983 and 1985, Friedman wrote eight articles which were published in the *Voice.* None of these articles has ever been the target of a defamation lawsuit. *See Nelson,* 626 F.Supp. at 976 ("The publication of a great number of articles over a substantial period by the freelance journalist in question without the accuracy of those articles ever having been challenged provides sufficient reason to trust that source.") (citing *Ortiz,* 478 N.Y.S.2d at 899). Indeed, the Chaikens have not provided any evidence that questions or concerns were ever raised to the *Voice* about Friedman's reporting before 1985.

The *Voice* also subjected the article to its normal editing process. Two editors reviewed the article before it was shown to Robert Friedman, then the Publisher of the *Voice* (no relation to the author of the article). In addition, technical facts and sources of information were verified by copy editors before publication. Although the *Voice,* following its customary practice, did not confirm the statements attributed to the Chaikens before publication, a reasonable trier of fact could not find that this establishes the *Voice*'s irresponsibility. The *Voice* is not required to confirm the quotes and views attributed to the Chaikens before publication. *See Karaduman,* 51 N.Y.2d at 549, 435 N.Y.S.2d 556, 416 N.E.2d 557.

█ The Chaikens argue that the *Voice* is not entitled to rely on Friedman's integrity because he clearly had an anti-Israel, anti-Jewish or anti-Chaiken bias, as reflected in his writings. The Chaikens point to a number of Friedman articles which are critical of the Israeli right-wing and West Bank extremist groups. *See "Poison Pen,"* printed in *Jewish Week,* April 29–May 5, 1994 (attached to Plaintiffs' Ex. I at p. 58) (providing an overview of Friedman's work and detailing criticisms of his alleged anti-right wing bias). However, Friedman's subjective beliefs are irrelevant to an inquiry into whether the *Voice* acted in a grossly irresponsible manner. The gross irresponsibility test is an objective one which focuses on the defendant's conduct leading up to the time of publication. Friedman's subjective beliefs or purported ill will toward Jews are therefore irrelevant to the *Voice*'s liability. *See Chaiken v. VV Publishing Corp.,* Order, March 16, 1994, 1994 WL 876418 (Preska, J.). In addition, there is no evidence that the *Voice* was aware of Friedman's purported biases when it published the article. To the contrary, Friedman wrote many of the articles detailed in *"Poison Pen"* after 1985. *See* Plaintiffs' Ex. I at p. 61. Friedman also had no contact with the Chaikens before travelling to Israel in 1985 to write the article.

Nor is the article so "inherently implausible" as to put the *Voice* on notice that the story would require independent verification. *See Gaeta,* 62 N.Y.2d at 340, 477 N.Y.S.2d 82, 465 N.E.2d 802 (holding newspaper and reporter had no duty to make further inquiry before publishing an article in part because

the facts had "inherent plausibility"). Fried-man travelled to Hebron in the wake of an arrest of settlers and army officers for a number of violent attacks on West Bank Arab residents and officials. The article described these attacks as well as the underlying ideology behind the violence. In this context, the Chaikens' virulent anti-Arab sentiments and actions cannot be considered implausible; rather, they are entirely consistent with the purported motivations fueling Jewish-based terrorism.

Finally, the Chaikens contend that the *Voice* was grossly irresponsible because it should have foreseen the article's defamatory implication that the Chaikens were terrorists. The article does not state that the Chaikens are terrorists—Friedman's account of his interview with the Chaikens is intended to orient the reader to the ideology behind the growth of the Jewish underground. The article also does not state that the Chaikens have engaged in any deadly activity. However, there is some support for the contention that the article implies the Chaikens are terrorists. For example, the statement that "Settlers like the Chaikens have turned the more than 114 settlements that now dot the West Bank into hothouses for the growth of terrorism" can be read to imply that the Chaikens are somehow involved with the anti-Arab violence detailed in the rest of the article. In addition, the article's title—*In the Realm of Perfect Faith: Israel's Jewish Terrorists*—juxtaposes a quote from Marilyn Chaiken with "Terrorists." [9]

■ Even assuming that the article can be read to imply that the Chaikens are terrorists, the *Voice* cannot be held grossly irresponsible on this basis. A publisher is not liable for a defamatory innuendo unless it intended or endorsed that inference. *See Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087, 1093 (4th Cir.1993) (citing *White v. Fraternal Order of Police,* 909 F.2d 512, 520 (D.C.Cir.1990)). There is no evidence that the *Voice* intended to imply the Chaikens were terrorists; indeed, the article does not state that they are terrorists, and it would be

speculation to assume that the *Voice* realized that such an implication was possible.

*Schermerhorn v. Rosenberg,* 73 A.D.2d 276, 426 N.Y.S.2d 274 (2d Dep't 1980), cited by Plaintiffs, is not to the contrary. In *Schermerhorn,* the court held that "defamatory head lines are actionable though the matter following is not, unless they fairly indicate the substance of the matter to which they refer ..." *Id.* 426 N.Y.S.2d at 283 (citations and quotations omitted). However, in *Schermerhorn* the head line at issue—"Schermerhorn Says NDDC Can Do Without Blacks"—specifically mentioned the plaintiff and was therefore held to be actionable. By contrast, the headline of the *Voice* article does not mention the Chaikens and is not independently defamatory. The defamatory implication that the Chaikens are terrorists only arises, if at all, after reading the entire article, including the headline. It would be unreasonable for the trier of fact to find that the Voice was grossly irresponsible because it failed to foresee that innuendo, especially in light of the other evidence of the *Voice*'s responsibility.

### B. *Vicarious Liability*

Unable to establish that the *Voice* was grossly irresponsible in publishing the article, Plaintiffs contend that the *Voice* should still be liable for the defamatory statements under the doctrine of *respondeat superior.* The *Voice* would not be entitled to summary judgment if Friedman was a *Voice* employee, because I must assume, solely for the purpose of summary judgment, that he fabricated or substantially distorted his interview with the Chaikens. *See Karaduman,* 51 N.Y.2d at 552–53, 435 N.Y.S.2d 556, 416 N.E.2d 557 (reporters' irresponsible conduct in writing article exposes reporters *and* their employer to liability). However, the Chaikens' argument necessarily rests on the assumption that Friedman was a *Voice* employee and not an independent contractor.

■ In determining if an employee-employer relationship exists, the test is whether

---

**9.** The Chaikens submitted letters from a newspaper editor, media commentator, and writer as "expert affidavits" to support their contention that the article implies that the Chaikens are terrorists and the *Voice* was therefore irresponsible.

"the purported employer controls or has the right to control both the result to be accomplished, and the manner and means by which the purported employee brings about that result." *Hilton Int'l Co. v. NLRB*, 690 F.2d 318, 320 (2d Cir.1982) (citations and internal quotations omitted). Although no single factor is determinative, a court may consider numerous factors:

> whether the purported employee is engaged in a distinct occupation . . .; whether the work involved is usually done under an employer's direction or by an unsupervised specialist; the skill involved; who supplies the instrumentalities and place of performance . . .; the method of payment (by the time or by the job); whether the work is part of the employer's regular business and/or necessary to it; and the intent of the parties creating the relationship.

*Id.* at 320–21 (citing Restatement (Second) of Agency § 220(2)); *see also Nelson*, 626 F.Supp. at 977–78.

■ There is no doubt that Friedman was an independent contractor. As an experienced reporter, Friedman controlled the manner in which the article was written—including the selection of a topic, research plan, and sources—without any guidance from the *Voice*. *Voice* editors reviewed the article only after Friedman completed a draft, and the editors subsequently made few substantive changes. Moreover, the terms and conditions of Friedman's employment provide compelling evidence of his independent status: he did not receive a regular salary and was only paid for articles the *Voice* decided to publish; did not have a contract; did not receive fringe benefits; did not have taxes withheld; did not maintain an office at the *Voice;* and was not listed on the masthead of the *Voice* as a staff writer. *See Nelson*, 626 F.Supp. at 978 (holding at summary judgment stage that terms and conditions of author's employment established he was independent contractor). By contrast, the Chaikens have provided no evidence to indicate that Friedman was a *Voice* employ-

ee.[10] Accordingly, the *Voice* cannot be held liable under the doctrine of *respondeat superior*.

### III. *Intentional Infliction of Emotional Distress*

■ Plaintiffs also claim that the *Voice* is liable for intentional infliction of emotional distress. However, this tort should not be used to circumvent the established and carefully balanced framework of constitutional and state libel law. In the context of public figures and defamation claims, the Supreme Court has held that a public figure cannot recover for intentional infliction of emotional distress by reason of an offending publication without first proving the elements of a defamation claim. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (public figure must demonstrate that the offending publication contains a false statement of fact which was made with "actual malice" before recovering for intentional infliction of emotional distress based on the publication); *see also Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) (intentional infliction of emotional distress claim stemming from publication of photograph dismissed after invasion of privacy claim based on same publication dismissed). Similarly, a private figure plaintiff should not be able to recover for intentional infliction of emotional distress created by a newspaper article unless the plaintiff can first demonstrate that the article was published with gross irresponsibility; indeed, any other rule would constrict the "breathing space" needed for freedom of expression. *Falwell*, 485 U.S. at 52, 108 S.Ct. at 879 (citation omitted). Accordingly, Plaintiffs' intentional infliction of emotional distress claims are dismissed with their libel claims.

### CONCLUSION

The Court is mindful of the potential predicament of a private individual who feels defamed by a newspaper article. Without

---

**10.** That Friedman was an independent contractor in 1985 is made even more apparent by the fact that in 1989, he entered into a written agree-

ment with the *Voice*, began to receive salary and benefits, and was listed as a staff writer. *See* Friedman Aff. at ¶ 18.

any effective access to a public audience, the individual may be left with the false assertions and innuendos created by the defamatory publication. Indeed, if Friedman's account of his interview with the Chaikens was fabricated or substantially distorted, it is unfortunate that Marilyn Chaiken is now left without any redress. However, the Chaikens have produced no evidence that the *Voice* was grossly irresponsible in publishing the offending article. Defendant's motion is therefore granted and the case is dismissed.

SO ORDERED.